IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WILLIAM M. ENDRES,

    Plaintiff,

v.

ELENA TOOTELL,

    Defendant.

NO. C10-3924 TEH

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

   This matter came before the Court on July 9, 2012, on Defendant Elena Tootell's motion for summary judgment. After careful consideration of the parties' written and oral arguments, the Court now GRANTS Defendant's motion for the reasons set forth below.

**BACKGROUND**

   Plaintiff William M. Endres, an inmate at San Quentin State Prison, originally sought damages and injunctive relief under 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act of 1973, from Defendants California Department of Corrections and Rehabilitation; the California Prison Health Care Receivership; J. Clark Kelso, Receiver; Vincent Cullen, Warden at San Quentin; and Elena Tootell, Chief Medical Executive at San Quentin (erroneously named as Elaine Tootell, Chief Medical Officer). Endres significantly narrowed his claims in the now-operative first amended complaint and now seeks only damages against Defendant Tootell under § 1983. He voluntarily dismissed all other claims and Defendants.

   It is undisputed that Dr. Tootell never once treated Endres, nor did she exercise her authority as the chief medical executive of the prison to deny him any care. Endres bases his claim for damages on his assertion that the delay in treatment for his schwannoma, a benign nerve sheath tumor, between "the onset of [his] symptoms in the fall of 2008 and [his]

1  surgery at UCSF [the University of California, San Francisco] over one year later," Endres
2  Decl. ¶ 17, reflects unlawful deliberate indifference by Dr. Tootell.
3       Endres's symptoms began in August 2008, following an epidural procedure for neck
4  pain. At various times, Endres complained to San Quentin medical personnel of headaches,
5  facial numbness, loss of balance, and neck and back pain. He was seen by medical staff
6  twice in September 2008 and was referred for a CT scan. Ex. A to Yen Decl. at 426, 430-31
7  (excerpts from Endres's unit health record). The scan showed a 3 cm x 2 cm lesion which,
8  on October 19, 2008, was deemed to be "most consistent with a cholesteatoma of the petrous
9  apex." *Id.* at 189. The radiologist recommended further evaluation with an MRI, which was
10 ordered after Endres was seen by his primary care physician, Dr. John Cranshaw, on
11 November 26, 2008. *Id.* at 413. The MRI was performed three weeks later and was deemed
12 on December 26, 2008, to be negative by the radiologist, who suggested a further CT scan of
13 temporal bones to evaluate a potential cholesteatoma. *Id.* at 184.
14      On January 7, 2009, Endres was seen by a different physician, Dr. Persender, who
15 ordered the CT scan. *Id.* at 407. The CT scan did not show conclusive results and, on
16 January 27, 2009, the radiologist recommended a further MRI with gadolinium, a contrast
17 agent. *Id.* at 183. Dr. Cranshaw saw Endres again on February 11, 2009, and scheduled an
18 MRI with gadolinium for March 19, 2009. *Id.* at 394. Dr. Cranshaw saw Endres two
19 additional times before the MRI, *id.* at 391, 393, which the radiologist described as showing
20 a possible nerve sheath tumor, *id.* at 182. On March 24, 2009, Dr. Cranshaw referred Endres
21 to an otolaryngologist at UCSF "as this will require particularly delicate surgery." *Id.* at 389.
22 On April 14, 2009, Endres was seen by another physician at San Quentin, Dr. Sona
23 Aggarwal, who noted that Endres had been referred to UCSF and that "[w]e will followup
24 [sic] on the status of that referral, and we will continue to follow his neurologic
25 symptomatology." *Id.* at 386.
26      Endres was seen by Dr. Ivan El-Sayed at UCSF on May 15, 2009, and diagnosed with
27 a schwannoma, rather than a cholesteatoma. Endres states in his declaration that
28 Dr. El-Sayed told him that he "should be scheduled for surgery in June 2009," Endres Decl.

¶ 6, but neither party presented any medical records to support this hearsay statement.

Dr. El-Sayed's report, dated May 29, 2009, states:

> I have referred the patient to see my colleagues in neurosurgery so that we can discuss the pros and cons of a transnasal endoscopic biopsy versus an open lateral approach. The location of this lesion would look quite amenable to a transnasal endoscopic biopsy except for the location of the carotid artery and therefore would require dissection through the pterygoid plates and pterygoid muscle up through the foramen rotundum, which is an unusual approach. Given the imaging characteristics, it would also be driven by the patient's symptoms and the option of observation with follow-up imaging considered. However, given that he is having progressive headaches, balance, and potentially some symptoms of tinnitus, we may be pushed for biopsy and decompression at some point. I have made a referral for my neurosurgical colleagues and sent the film down for unofficial review with Dr. Glassenberry of neuroradiology, who agrees with my assessment that this is most likely a schwannoma. I will wait for input from Dr. Parsa of neurosurgery.

Ex. 8 to Tootell Dep. at 2 (attached to Ex. A to Weixel Decl.).

Dr. Cranshaw saw Endres again on May 19, June 17, June 19, July 2, and July 27, 2009. Ex. A to Yen Decl. at 359, 366-67, 370-372, 379-80. At or following these appointments, Dr. Cranshaw contacted UCSF, both directly and through the San Quentin employee who schedules outside visits, to attempt to schedule a follow-up appointment for Endres. Dr. Cranshaw noted no changes in Endres's condition, which Dr. Cranshaw considered to be stable.

Endres was seen again at UCSF on August 11, 2009, when he was examined by Dr. Andrew Parsa, a neurosurgeon. Dr. Parsa discussed with Endres:

> the importance of long-term follow-up and the necessity of surgical intervention to establish a diagnosis. The approach remains to be determined for this lesion, and I will be reviewing this with you [Dr. El-Sayed] at our Multi-Disciplinary Skill-Based Tumor Conference to facilitate the mutually agreeable approach. Once we have agreed upon the appropriate approach, then I think the next step will be to schedule him for surgery. I reviewed all this with him, and the patient is amenable.

Ex. B to Yen Decl. at UCSF-MED-00066 to 00067. Dr. Parsa saw Endres again on October 27, 2009, at which time Endres "agreed to move forward with surgical resection." *Id.* at UCSF-MED-00064.

3

In the interim, Endres was seen at San Quentin by Dr. Cranshaw on August 13, August 27, September 16, and October 19. *Ex. A to Yen Decl.* at 345-46, 350-51, 353-55. Dr. Cranshaw again attempted to follow-up with scheduling and with UCSF directly to ensure that Endres would be seen. Dr. Cranshaw ordered an MRI that accompanied Endres to his October 27 appointment with Dr. Parsa. *Id.* at 345. A different San Quentin physician, Dr. Denise Reyes, saw Endres on November 2, 2009, and noted that Endres was "due to have surgery with Dr. Parsa at UCSF within the next couple weeks." *Id.* at 342-43.

Dr. Parsa performed surgery on November 16, 2009. *Ex. B to Yen Decl.* at UCSF-MED-00044. Complete resection was not possible due to the tumor's location and the involvement of the cavernous sinus. *Id.* at UCSF-MED-00003. Dr. Parsa confirmed a "benign diagnosis of schwannoma. Accordingly, given the patient's desire to avoid significant morbidity and the diagnosis of a benign tumor, we have elected to stop our resection and facilitate as well as maximize the patient's postoperative status." *Id.* at UCSF-MED-00045.

Following his surgery, Endres was seen by Dr. Cranshaw on November 23, 2009, and January 26, February 2, and February 9, 2010. *Ex. A to Yen Decl.* at 064-67, 338-39. At these appointments, Dr. Cranshaw did not note any changes in symptoms and once again followed up with the San Quentin scheduler about subsequent appointments at UCSF. On February 2, Dr. Cranshaw noted that UCSF informed the scheduler that Endres was on the tumor board for discussion of his case. *Id.* at 065. On February 9, Dr. Cranshaw noted that Endres was scheduled to meet with neurooncology for an MRI and gamma knife treatment in early March. *Id.* at 064. The gamma knife radiosurgery was performed by Dr. Parsa at UCSF on March 10, 2010, and was completed without complications. *Ex. B to Yen Decl.* at UCSF-MED-00008.

On August 24, 2010, Endres had a follow-up MRI at UCSF, which showed a "stable heterogeneously enhancing legion . . ., measuring 2.5 x 1.3 x 1.5 cm. . . . These findings are consistent with a trigeminal schwannoma. . . . There is no reduced diffusion. No new lesions are identified." *Id.* at UCSF-MED-00007. Dr. Parsa determined that there were "no

4

1  significant changes after Gamma Knife radiosurgery. Accordingly, we will be following him
2  with an annual scan and clinic visit." *Id.* at UCSF-MED-00003.

3      Dr. Cranshaw saw Endres on September 2, 2010, at which time Endres reported
4  feeling better. Ex. A to Yen Decl. at 037-38. However, Endres complained of increased pain
5  and pressure in his head and requested to be seen by Dr. Cranshaw again on September 15.
6  *Id.* at 036. Dr. Cranshaw saw Endres on September 17, at which time he noted that Endres's
7  pain was likely due to trauma caused by the surgery or gamma knife treatment and prescribed
8  pain medication. *Id.* at 034. This is the last medical contact contained in the record, but it is
9  clear that Endres continued to see Dr. Cranshaw after this period. *See, e.g.,* Endres Dep. at
10 61:5-12 (Ex. C to Yen Decl.) (testifying that he most recently saw Dr. Cranshaw on
11 August 30, 2011, for his "regular chronic care doctor's visit").

12     At his deposition on September 21, 2011, Endres testified that he was still on
13 tramadol, a pain medication. *Id.* at 6:20-23. He further testified that he continued to be in
14 pain from his tumor and, on a scale of one to ten, categorized the pain as "[u]sually seven.
15 At times, it gets to a ten." *Id.* at 60:20-25. When asked about his symptoms, he said: "Well,
16 besides the headaches, the head pain, and the loss of balance, and the tinnitus, you know, the
17 ringing, the high pitch in the head has gotten worse. My coordination seems to be not right;
18 my distance judgment, coordination." *Id.* at 61:23-62:2. Dr. Cranshaw told him that he
19 should be seeing the neurologist at San Quentin, that he was scheduled for an MRI in
20 December 2011, and that he was supposed to see Dr. Parsa at UCSF again in January. *Id.* at
21 62:4-12.

22     Endres contends that Defendant Tootell was made aware of his medical issues on
23 April 28, 2009, when another inmate, Kamal Sefeldeen, "first brought Mr. Endres's
24 condition and his requests for health services to the attention of Dr. Tootell" at an inmate
25 advocacy group meeting. Sefeldeen Decl. ¶ 7. Dr. Tootell testified that she does not recall
26 this conversation and did not know about Endres's condition until after Sefeldeen called her
27 office on July 16, 2009. Tootell Dep. at 18:16-23 (Ex. D to Yen Decl.); Ex. 3 to Tootell Dep.
28 (attached to Ex. D to Yen Decl.). The same day that her office received the telephone call,

5

Dr. Tootell sent an email to Dr. Cranshaw and Tara Kesecker, the San Quentin scheduler, to inquire about Endres's situation. Ex. 3 to Tootell Dep. She reviewed Endres's medical record "within a matter of days," and testified that, "[t]he things that stood out to [her] were that he was being seen very frequently by Dr. Cranshaw and that Dr. Cranshaw and Tara were very well aware of what was going on in terms of his schedule and trying to work with UCSF about getting him out." Tootell Dep. at 36:19-24, 37:7-11. She did not consider any of the symptoms she saw in Endres's record to indicate a need for immediate outside care. *Id.* at 39:3-18. After July 2009, Dr. Tootell spoke periodically with both Dr. Cranshaw and the scheduler about Endres. Her conclusions after doing so were "[t]hat [Dr. Cranshaw] was seeing Mr. Endres regularly, his symptoms did not reach the point of emergency, and they were attempting with a lot of frustration to schedule the surgery and appointments with Dr. Parsa with frustration. They were very frustrated with that. . . . And reassured me that Dr. Cranshaw was seeing Mr. Endres regularly to monitor the situation." *Id.* at 49:6-10, 20-21. Dr. Tootell recalls having a conversation with Dr. Cranshaw in August or September 2009 about whether it made sense to find a different neurosurgeon due to the difficulties with scheduling the surgery at UCSF, but "it was decided that we seemed at that point fairly close with getting this organized with Dr. Parsa" at UCSF. *Id.* at 49:22-50:18. Dr. Tootell also believed that it was better not to find an alternate provider for Endres because UCSF "would be able to offer the best surgery for him." *Id.* at 36:3-6.

**LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The court may not weigh the evidence and must view the evidence in the light most favorable to the nonmoving party. *Id.* at 255.

6

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings or materials in the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). However, on an issue for which its opponent will have the burden of proof at trial, the moving party can prevail merely by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial to defeat the motion. *Anderson*, 477 U.S. at 250.

**DISCUSSION**

The Eighth Amendment prohibits deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A "serious medical need" exists if "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (quoting *Estelle*, 429 U.S. at 104), *overruled in part on other grounds by WMX Techs., Inc. v Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). Dr. Tootell concedes, for purposes of this motion, that Endres had a serious medical need. Mot. at 11.

A prison official is "deliberately indifferent" if he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Prison officials violate their constitutional obligation only by "intentionally denying or delaying access to medical care." *Estelle*, 429 U.S. at 104-05. Medical malpractice or negligence does not establish deliberate indifference, nor does a difference of opinion as to which medically acceptable course of treatment should be followed. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir.

7

1 2004); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). When a plaintiff contends that
2 doctors should have chosen a different course of action, he or she "must show that the course
3 of treatment the doctors chose was medically unacceptable under the circumstances," as well
4 as showing that the doctors "chose this course in conscious disregard of an excessive risk to
5 plaintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citations omitted).
6 When a plaintiff bases a deliberate indifference claim on delayed treatment, he or she must
7 show that the delay was harmful, although such harm need not be substantial. *McGuckin*,
8 974 F.2d at 1060 (citations omitted).

9       Endres fails to meet this standard because he points to nothing in the record that
10 indicates that earlier surgery would have allowed complete resection of his tumor or would
11 have been more successful in any way. Indeed, at his deposition, Endres testified that he
12 continued to suffer what he considered to be a high degree of pain even after receiving both
13 the initial surgery and gamma knife treatment, just as he alleged in the complaint that he "has
14 been experiencing *the same* pain, hearing problems, and other symptoms that he was having
15 before the surgery. In fact, some of those symptoms have continued to increase at times."
16 First Am. Comp. ¶ 23 (emphasis added). Thus, while Endres may have suffered pain while
17 he was waiting for surgery, he admits that his pain after surgery was either the same as or
18 greater than before surgery. Consequently, no rational fact finder could conclude that
19 delaying surgery inflicted any additional harm on Endres; he would have suffered the same
20 set of harms even if he had received surgery sooner. *Cf. Jett v. Penner*, 439 F.3d 1091, 1098
21 (9th Cir. 2006) (finding sufficient evidence of harm to survive summary judgment where
22 "[t]he radiology summaries clearly indicate, because the fracture did not align upon healing,
23 the thumb was deformed; this deformity was inferentially caused by the delay in referring
24 [the plaintiff] to an orthopedist who could have properly set and cast his fractured thumb").

25       Nor is there any evidence that delaying surgery in any way increased Endres's risk of
26 harm. Endres asserts that "inasmuch as a schwannoma is a growing tumor, it is not
27 unreasonable to believe that the tumor might have been resected with more success had it
28 been discovered earlier and surgery scheduled much sooner." Opp'n at 16. However, he

8

1 does not present any evidence to support this speculation, and "[l]egal memoranda and oral
2 argument, in the summary-judgment context, are not evidence, and do not create issues of
3 fact capable of defeating an otherwise valid motion for summary judgment." *Smith v. Mack*
4 *Trucks, Inc.*, 505 F.2d 1248, 1249 (9th Cir. 1974) (per curiam). Moreover, the record
5 demonstrates that Endres's treating physicians did not consider Endres's condition to require
6 immediate surgery, nor did they indicate any risk of delay. For example, Dr. El-Sayed did
7 not state in his May 29, 2009 report that surgery was urgent, or that he had put in an
8 emergency referral to Dr. Parsa; instead, he stated simply that it was referred to neurosurgery
9 and that he would "wait for input from Dr. Parsa." Ex. 8 to Tootell Dep. at 2. Similarly,
10 Dr. Parsa did not opine that immediate surgery was necessary in August 2009 but instead
11 concluded that Endres's case should proceed through the Multi-Disciplinary Skill-Based
12 Tumor Conference. Ex. B to Yen Decl. at UCSF-MED-00066. Further, Dr. Tootell and
13 Dr. Cranshaw consulted with each other and agreed that none of Endres's symptoms required
14 emergency surgery. They also agreed that it was preferable to wait for an appointment at
15 UCSF, rather than send Endres to an alternate provider, because UCSF would provide Endres
16 with the "best surgery." Tootell Dep. at 36:3-6. When asked at oral argument to identify
17 contrary evidence in the record, Endres's counsel stated only that a reasonable jury could
18 agree or disagree with Dr. Tootell's conclusion that she saw nothing in Endres's file that
19 warranted immediate intervention. This is insufficient to meet his burden: "The possibility
20 that the plaintiff may discredit the defendant's testimony at trial is not enough for the
21 plaintiff to defeat a properly presented motion [for summary judgment]." *United*
22 *Steelworkers of Am. v. Phelps Dodge Corp.* 865 F.2d 1539, 1542 (9th Cir. 1989).

23 The only fact for which there is disputed evidence in the record is the date on which
24 Dr. Tootell first became aware of Endres's condition. Endres contends that Dr. Tootell
25 learned of his condition on April 28, 2009, whereas Dr. Tootell testified that she does not
26 recall learning about Endres's condition until July 16, 2009. However, nothing in the record
27 indicates any increased harm or risk of harm between April 28 and July 16, when it is
28 undisputed that Dr. Tootell first examined Endres's case, and there is no indication that any

9

earlier intervention by Dr. Tootell would have led to Endres's being seen at UCSF any earlier. In fact, Endres was seen at UCSF by Dr. El-Sayed on May 15, 2009, just seventeen days after Endres contends Dr. Tootell was first told about his condition. Thus, the dispute over when Dr. Tootell first became aware of Endres's condition is not material given the circumstances of this case. In light of all of the above, the Court GRANTS summary judgment to Defendant Tootell on Endres's deliberate indifference claim.

Defendant Tootell has also moved for summary judgment on Endres's remaining claims: that his Eighth Amendment rights were violated because he was subjected to unlawful conditions of confinement and because his treatment was provided according to an unlawful policy or custom. Endres failed to respond to these arguments in his opposition and has not identified any disputed fact that would prevent summary judgment on either of these claims. In addition, he has failed to distinguish these claims from his deliberate indifference claim, which the Court has already found appropriate for resolution by summary judgment. Accordingly, the Court also GRANTS summary judgment on Endres's two remaining claims.

## CONCLUSION

With good cause appearing for the above reasons, Defendant Tootell's motion for summary judgment is GRANTED in its entirety. The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: 07/11/12

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT